1998 ME 251

**STATE of Maine**

v.

**Dean MICHAUD.**

Supreme Judicial Court of Maine.

Argued Oct. 6, 1998.
Decided Nov. 25, 1998.

Andrew Ketterer, Attorney General, Donald W. Macomber (orally), Asst. Atty. Gen., Fernand R. LaRochelle, Asst. Atty. Gen., Augusta, for State.

E. Allen Hunter (orally), Solman & Hunter, P.A., Caribou, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and ALEXANDER, JJ.

RUDMAN, J.

[¶ 1] Dean Michaud ("Michaud") appeals from the judgment of the Superior Court (Aroostook County, *Calkins, J.*) in a jury-waived trial finding him guilty of reckless manslaughter in violation of 17–A M.R.S.A. § 203(1)(A) (1983 & Supp.1998),[1] and from the sentence imposed. Michaud contends that: (1) the court erred in denying his motion to suppress; (2) the evidence was not sufficient to either (a) establish the *corpus delicti* for homicide, (b) establish recklessness, (c) establish causation, or (d) disprove his self-defense claim; (3) the court erred in denying his request for specific findings of fact and conclusions of law; and (4) the court erred in sentencing. Finding no error, we affirm both the judgment and the sentence.

[¶ 2] The State presented evidence at trial that would permit the following factual findings: On September 11, 1996, Michaud caused the death of Thomas Maki ("Maki") by drowning him in the St. John River in Frenchville, Maine. Prior to the incident, Maki had recently begun courting Michaud's former girlfriend, Barbie Ouellette ("Ouellette"). After an "on again, off again" romantic relationship that lasted approximately fourteen months, Michaud broke up with Ouellette for the third and final time on September 3, 1996. Maki met Ouellette during the same week and began spending time with her, much to Michaud's chagrin. Michaud became jealous because Ouellette showed a growing interest in Maki. After many unsuccessful attempts to salvage his relationship with Ouellette, Michaud asked Maki to accompany him to the St. John River to talk on September 11, 1996. An altercation broke out between Michaud and Maki in the shallow water near the rocky shore of the river. During the struggle, Michaud pushed or struck Maki and caused him to fall on his back and hit his head on the rocks. While grappling in the shallow water with Michaud on top of him, Maki inhaled water while his head was below the surface. At the time of the drowning, Michaud was an eighteen-year-old student at the University of Maine at Fort Kent ("UMFK") and a citizen of New Brunswick, Canada. Maki was a twenty-year-old UMFK student. Michaud was approximately 6'4" tall and weighed around 180 to 200 pounds. Maki was 5'10" tall and weighed 150 pounds. An autopsy examination revealed numerous injuries to Maki's head, throat, neck, and back. Michaud had no injuries except for one or two small red spots on his face.

I.

[¶ 3] Michaud first asserts that the court erred in denying his motion to suppress statements made to the police on September 11 and 12, 1996, because he was "in custody" and did not receive Miranda[2] warnings. The United States Supreme Court in *Miranda v. Arizona* held that, in order to safeguard an uncounseled criminal defendant's Fifth Amendment privilege against self-incrimination, law enforcement officers may not begin a custodial interrogation before warning the

---

1. Section 203 of Title 17–A states, in relevant part:
 1. A person is guilty of manslaughter if that person:
 A. Recklessly, or with criminal negligence, causes the death of another human being[;]

. . . .

17–A M.R.S.A. § 203(1) (1983 & Supp.1998).

2. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The United States Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995) (quotations omitted). Therefore, a *Miranda* warning is necessary only if a defendant is: (1) "in custody"; and (2) "subject to interrogation." *State v. Swett*, 1998 ME 76, ¶ 4, 709 A.2d 729, 730.

[¶ 4] A defendant is "in custody" if subject to either: (a) a formal arrest; or (b) a "restraint on freedom of movement [to] the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quotations omitted). To determine whether a defendant was restrained to the degree associated with a formal arrest, a court must ascertain "whether a reasonable person in the defendant's position would have believed he was in police custody and constrained to a degree associated with formal arrest." In making this "reasonable person" analysis of whether a defendant is "in custody," a court may examine a number of objective factors, including:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*See, e.g.*, *State v. Gardner*, 509 A.2d 1160, 1163 n. 3 (Me.1986); *State v. Thibodeau*, 496 A.2d 635, 639 (Me.1985); *Stansbury v. California*, 511 U.S. 318, 322 (1994). We will not reverse a trial court's custodial determination unless the record fails to rationally support the finding. See *Swett*, 1998 ME 76, ¶ 4, 709 A.2d at 730.

[¶ 5] After examining the above factors in light of the September 11, 1996 hospital interview, the court concluded that, "under the totality of the circumstances, ... a reasonable person in the defendant's position would not have believed he was in police custody and constrained to a degree associated with formal arrest." After analyzing the facts surrounding the September 12, 1996 interview at the crime scene, the court also found "little merit to the suggestion that the interviews ... were custodial." Based on the above custodial interrogation factors, the record contains evidence that rationally supports the conclusion that Michaud was not "in custody" when he spoke with the police at the hospital. *See State v. Carr*, 1997 ME 221, ¶ 11, 704 A.2d 353, 356–57. Therefore, the court did not err in denying Michaud's motion to suppress the statements he made during either the hospital interview or the crime scene interview.

## II.

### A.

[¶ 6] Michaud challenges the trial court's *corpus delicti*[3] ruling. In a homicide case, the *corpus delicti* rule requires the State to establish both that: (1) the victim died; and (2) a criminal agency was responsible for the death.[4] *See State v. Buzzell*, 617 A.2d 1016, 1019 (Me.1992). The State's burden of proving the *corpus delicti* (*i.e.*, that the victim died as the result of a criminal agency) has two prongs. *See State v. Chad B.*, 1998 ME 150, ¶ 5, 715 A.2d 144, 146. First, the State must produce sufficient evidence to prove the *corpus delicti* under a "substantial belief" standard, without relying on any of the defendant's post-crime admissions. *See id.* Second, after including the defendant's post-crime admissions, the entire record must contain sufficient evidence to prove the *corpus delicti* beyond a reasonable doubt. *See id.*

[¶ 7] Under the first prong of the State's burden of proof, we review the trial court's factual findings only for clear error. *See Chad B.*, 1998 ME 150, ¶ 8, 715 A.2d at 146–47. However, whether the court's factual findings were sufficient to establish a substantial belief that the victim died as the result of a criminal agency is a question of law that we review *de novo*. See *id.*

[¶ 8] Pursuant to the *corpus delicti* rule, a court may not allow a defendant's admission in evidence[5] until the State has met its burden of proving the *corpus delicti* to a "substantial belief" standard, under the first prong.[6] *See State v. Reed*, 676 A.2d 479, 481 (Me.1996). The substantial belief standard is an objective standard that requires neither proof beyond a reasonable doubt nor proof by a fair preponderance of the evidence. *See Chad B.*, 1998 ME 150, ¶ 6, 715 A.2d at 146. Rather, the substantial belief standard "resembles the probable cause standard." *Id.* (quotations omitted). "In the context of the *corpus delicti* rule, '[p]robable cause exists where facts and circumstances within the [factfinder's] knowledge ... would warrant a prudent and cautious person to believe' that someone committed the crime." *Id.* (quotations omitted).

[¶ 9] When viewed objectively, the facts as the court found them were "sufficient to establish a substantial belief that [Maki] died as the result of a criminal agency," independent of Michaud's post-conviction admissions. *Id.* In light of Maki's injuries and Dr. Ryan's testimony, the evidence "would warrant a prudent and cautious person to believe" that Maki died as a result of criminal means, rather than by natural causes, accident, or suicide. *Id.* Nor would the existence of other explanations for the circumstances surrounding Maki's death preclude such a finding.[7] *See State v. Reed*, 676 A.2d 479, 482 (Me.1996). The State satisfied its

3. *"Corpus delicti"* literally means "body of the crime," and consists of two elements: (1) the fact of the victim's death; and (2) the existence of a criminal agency responsible for the death. Field & Murray, *Maine Evidence* § 801.9 at 403 (4th ed.1997) [hereinafter Field & Murray]; *State v. Reed*, 676 A.2d 479, 481 (Me.1996).

4. Since the fact of Maki's death is not in dispute, only the second element of the *corpus delicti* (*i.e.*, criminal agency) is at issue on appeal.

5. (Pursuant to the M.R. Evid. 801(d)(2) hearsay exclusion.)

6. **Caveat:** As Field & Murray noted:

 Proof of corpus delicti as a legal prerequisite to admissibility of a criminal defendant's confes-

sion or admission does not mean that the corpus delicti must necessarily be established before the confession can be received at the trial. There is a "strong preference" for proof of the corpus delicti before actually admitting any inculpatory statement of the defendant. However, the trial court's discretion under Rule 611(a) as to the order of proof can extend to permitting the introduction of an inculpatory statement subject to later proof of corpus delicti.

 Field & Murray § 801.9 at 404 (citing *State v. Snow*, 438 A.2d 485 (Me.1981); *State v. Cruz*, 594 A.2d 1082 (Me.1991)).

7. Field & Murray notes that "[t]he 'probable cause' aspect of the corpus delicti rule can be established by any kind of evidence which will

burden of introducing sufficient evidence independent of Michaud's statements to warrant a "substantial belief" of criminal agency. *See Chad B.*, 1998 ME 150, ¶ 6, 715 A.2d at 146. Therefore, the court did not err in determining that the State met its burden of proving the *corpus delicti* under the substantial belief standard.

 [¶ 10] Under the second prong of the State's burden of proof, we review the entire record (including the defendant's confessions or admissions) to see if it discloses sufficient evidence for the factfinder rationally to find beyond a reasonable doubt every element of the *corpus delicti*. *See Chad B.*, 1998 ME 150, ¶ 5, 715 A.2d at 146. After considering the three conflicting versions of Michaud's story, there are sufficient grounds for a court rationally to find beyond a reasonable doubt that Maki died by a criminal agency. Therefore, the trial court did not err in concluding that the State established both elements of the *corpus delicti* beyond a reasonable doubt.

### B.

 [¶ 11] Michaud next claims that the court erred in finding him guilty of manslaughter in violation of 17–A M.R.S.A. § 203 because the evidence was not sufficient to prove the element of "recklessness." [8] We review the sufficiency of the evidence "in the light most favorable to the State to determine whether a trier of fact rationally could find beyond a reasonable doubt every element of the offense charged." *Chad B.*, 1998 ME 150 at ¶ 11, 715 A.2d at 147–48 (quotations omitted). The factfinder is entitled to "draw all reasonable inferences from the evidence." *State v. Wells*, 658 A.2d 654, 656 (Me.1995).

 [¶ 12] Reckless manslaughter consists of "[r]ecklessly ... caus[ing] the death of another human being." 17–A M.R.S.A. § 203(1). Recklessness involves a conscious disregard of risk that grossly deviates from "the standard of conduct that a reasonable and prudent person would observe in the same situation." 17–A M.R.S.A. § 35(3) (1983 & Supp.1998).[9] When viewing the evidence in the light most favorable to the State, it is reasonable to infer from the record that Michaud forcefully caused Maki to fall on his back and strike his head on rocks and that Maki inhaled water while Michaud straddled him and held his head under water.[10] Such behavior certainly involves a con-

---

support the inference that a criminal act actually was committed." Field & Murray § 801.9 at 404.

8. Although either recklessness or criminal negligence may support a manslaughter conviction pursuant to section 203 of Title 17–A, the trial court only focused on recklessness, and did not discuss whether Michaud was criminally negligent. *See* 17–A M.R.S.A. § 203.

9. 17–A M.R.S.A. § 35(3) (1983 & Supp.1998) defines recklessness as follows:
 **3.** "Recklessly."
 **A.** A person acts recklessly with respect to a result of his conduct when he consciously disregards a risk that his conduct will cause such a result.
 **B.** A person acts recklessly with respect to attendant circumstances when he consciously disregards a risk that such circumstances exist.
 **C.** For purposes of this subsection, the disregard of the risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard

of conduct that a reasonable and prudent person would observe in the same situation.

10. Michaud claims that the State has failed to prove beyond a reasonable doubt the underlying facts supporting the inference that Michaud acted recklessly. Michaud cites *State v. Flash*, 418 A.2d 158 (Me.1980) for the proposition that the court can only draw inferences from facts that the State has proven beyond a reasonable doubt. In *Flash*, we stated that "where the state rests its case as to an element of the crime charged entirely on a permissible inference, the state must establish beyond a reasonable doubt the facts from which the inference is to be drawn." *Id.* at 163. The trial court determined that Michaud was reckless based on the medical evidence and the fact that Michaud lied when he told his three conflicting versions of the events. The State has certainly proven the medical evidence consisting of Maki's objectively verifiable injuries beyond a reasonable doubt. Michaud himself proved beyond a reasonable doubt that at least two of his three stories were false, by his adoption of conflicting versions of what happened. Therefore, Michaud's claim that the

scious disregard of risk that grossly deviates from a reasonable and prudent standard of care, particularly in light of Michaud's size advantage over Maki.

[¶ 13] The court found that "Michaud acted in conscious disregard that his actions created the risk of death to Maki, and his actions were a gross deviation from how a reasonable and prudent person would act under the circumstances." Upon "[v]iewing the evidence in the light most favorable to the State and drawing all reasonable inferences therefrom," the evidence was clearly sufficient to support a finding of recklessness beyond a reasonable doubt. *Wells*, 658 A.2d at 656. Therefore, the court did not err in finding Michaud guilty of reckless manslaughter.

### C.

■■■ [¶ 14] Michaud also claims that the evidence was insufficient to prove causation beyond a reasonable doubt. The court found that Michaud caused Maki's death because the death would not have occurred but for Michaud's conduct. When viewed in the light most favorable to the State, the medical evidence, Michaud's three conflicting stories, and his emotional behavior and jealousy toward Maki all support a reasonable inference that Maki would not have died but for Michaud's conduct. *See Chad B.*, 1998 ME 150 at ¶ 11, 715 A.2d at 147–48; *Wells*, 658 A.2d at 656. Therefore, the court did not err in finding that Michaud caused Maki's death beyond a reasonable doubt.

State failed to prove beyond a reasonable doubt the facts that the court relied on is without merit.

**11.** 17–A M.R.S.A. § 108 (1983 & Supp.1998) provides in pertinent part:

> **2.** A person is justified in using deadly force upon another person:
> **A.** When the person reasonably believes it necessary and reasonably believes such other person is:
> **(1)** About to use unlawful, deadly force against the person or a 3rd person;
> . . . .
> **C.** However, a person is not justified in using deadly force as provided in paragraph A, if:

### D.

[¶ 15] Michaud further contends that the court erroneously concluded that the evidence was not sufficient to raise the issue of self-defense.[11] He argues that, in reaching its decision, the court misconstrued and improperly applied 17–A M.R.S.A. § 101(1).[12] As a result, Michaud claims, the court erroneously excused the State from the burden of proof that section 101(1) imposes.

■■■ [¶ 16] "A person is justified in using deadly force on another when the person reasonably believes that another person is about to use unlawful, deadly force against the person or a third person." *State v. Sullivan*, 1997 ME 71, ¶ 7, 695 A.2d 115, 117 (citing 17–A M.R.S.A. § 108(2)(A)(1)). In *State v. Case*, we articulated the proper analysis for self-defense claims as follows:

> Pursuant to 17–A M.R.S.A. § 101(1) (1983), the State must disprove beyond a reasonable doubt any statutory defense "in issue as a result of evidence admitted at the trial which is sufficient to raise a reasonable doubt on the issue." A defense is "in issue" within the meaning of section 101 if the evidence is "sufficient to make the existence of all the facts constituting the defense a reasonable hypothesis for the factfinder to entertain." Either the State or the defense may introduce evidence that generates the State's obligation.

*State v. Case*, 672 A.2d 586, 589 (Me.1996) (quoting *State v. Begin*, 652 A.2d 102, 106 (Me.1995)). Therefore, a court must first determine whether self-defense is "in issue" (*i.e.*, "sufficient to raise a reasonable doubt on the issue") and, if so, must next determine

> **(1)** With the intent to cause physical harm to another, he provokes such other person to use unlawful deadly force against anyone;
> . . . .

**12.** Section 101(1) provides, in pertinent part:
> The State is not required to negate any facts expressly designated as a "defense," or any exception, exclusion or authorization that is set out in the statute defining the crime by proof at trial, unless the existence of the defense, exception, exclusion or authorization is in issue as a result of evidence admitted at the trial that is sufficient to raise a reasonable doubt on the issue, in which case the State must disprove its existence beyond a reasonable doubt. . . .
> 17–A M.R.S.A. § 101(1) (1983 & Supp.1998).

whether the State has met its burden of disproving self-defense beyond a reasonable doubt. *See id.*

### 1.

[¶ 17] In determining whether the evidence is sufficient to raise the issue of self-defense, "[a trial] court must view the evidence in the light most favorable to the defendant." *See Sullivan*, 1997 ME 71, ¶ 6, 695 A.2d at 117. In its order on Michaud's motion for further findings, the trial court stated that, "[b]ecause the evidence of self-defense was not believed by the fact finder, the issue did not sufficiently raise a reasonable doubt such that it had to be disproved by the State beyond a reasonable doubt." By stating that the court itself did not believe Michaud's self-defense evidence, the court failed to take the evidence "in the light most favorable to the defendant." *Sullivan*, 1997 ME 71, ¶ 6, 695 A.2d at 117. For the limited purpose of determining whether self-defense was "in issue," the court should have suspended its disbelief and assumed that Michaud's third story was true. *See id.*

[¶ 18] Michaud's third statement[13] to the police is sufficient for a court to entertain a "reasonable hypothesis" that Michaud acted in self-defense, if viewed in the light most favorable to him (*i.e.*, assuming he told the truth, despite his two earlier conflicting versions). *See State v. Begin*, 652 A.2d 102, 106 (Me.1995). The State concedes that the evidence, when viewed in the light most favorable to Michaud, was sufficient to generate the issue of self-defense.

### 2.

[¶ 19] After concluding that self-defense is "in issue," a court must determine whether the State has met its burden of disproving self-defense beyond a reasonable doubt. *See Case*, 672 A.2d at 589. Although the court concluded that self-defense was not "in issue," the court assumed, *arguendo*, that it was and went on to analyze whether the

State had disproven the self-defense evidence. After weighing all the evidence, including the "medical evidence, the physical evidence, the evidence of the jealousy of the defendant and the events leading up to the fatal day," the court was satisfied beyond a reasonable doubt that Michaud was not justified in using deadly force on Maki. When viewing the evidence in the light most favorable to the State, the evidence is sufficient to disprove every element of self-defense beyond a reasonable doubt. *See State v. Emerson*, 675 A.2d 978, 979 (Me.1996) (stating standard of review for sufficiency of evidence in criminal trials). Therefore, the court correctly analyzed whether the State had met its burden of disproving self-defense.

[¶ 20] Error in a criminal prosecution is only harmless if it is "highly probable that the error did not affect the factfinder's judgment." *State v. Jordan*, 1997 ME 101, ¶ 8, 694 A.2d 929, 931. The purpose of determining whether self-defense is "in issue" is to determine whether the State has the burden of disproving self-defense beyond a reasonable doubt. See 17-A M.R.S.A. § 101(1). After critically evaluating the evidence, the court concluded that the State had met its burden of disproving self-defense beyond a reasonable doubt. Hence, the court's error in assuming that selfdefense was not "in issue" did not affect the outcome. Therefore, the error was harmless, because it is "highly probable that the error did not affect the factfinder's judgment." *Jordan*, 1997 ME 101, ¶ 8, 694 A.2d at 931.

### III.

[¶ 21] Michaud claims that the court's written order on his motion for further findings of fact was erroneous because it did not specifically address every finding of fact and conclusion of law that he requested. Although he concedes that there is little Maine law to support his contention, he claims that the use of the word "shall" in M.R.Crim. P. 23(c)[14] "creates a mandatory duty for the

---

**13.** In Michaud's first two conflicting statements, he claimed that Maki slipped and fell in the water, and that Michaud was unable to save him from drowning. In his third statement, Michaud

conceded that an altercation broke out between them, but claimed he acted in self-defense.

**14.** Rule 23(c) governs trials without a jury in the Superior Court and provides:

[court] to respond to a request for findings on issues that are not covered within the written decision."

 [¶ 22] Rule 23(c) requires a trial court to make specific findings of fact upon request.[15] *See* M.R.Crim. P. 23(c). However, Rule 23(c) does not require a court to specify all the evidence it relied on in making its findings of ultimate fact. *See State v. Levi*, 384 A.2d 40, 42 (Me.1978). To the contrary, a court need only find as fact each of the elements of the offense, in order to satisfy the requirements of Rule 23(c). *See id.*; M.R.Crim. P. 23(c).

[¶ 23] The elements of reckless manslaughter are that:

(1) the defendant acted recklessly, by consciously disregarding a risk ...; (2) this disregard ... of a risk rises to a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation; and (3) the defendant's reckless ... conduct caused a death.

*State v. Bennett*, 658 A.2d 1058, 1064 (Me. 1995) (quoting *State v. Gammon*, 529 A.2d 813, 815 (Me.1987)). *See also* 17–A M.R.S.A. § 203(1)(A). In its original findings, the court found as fact that: (1) Michaud acted recklessly, by consciously disregarding that "his actions created the risk of death to Maki"; (2) Michaud's disregard of risk was "a gross deviation from how a reasonable and prudent person would act under the circumstances"; and (3) that Michaud's reckless conduct caused Maki's death. As discussed above, the court also found as fact that the State had disproven self-defense beyond a reasonable doubt. Therefore, the court's original findings were sufficient to satisfy Rule 23(c), and the court did not err by refusing to specifically address the subsidiary findings of fact that Michaud requested. *See Levi*, 384 A.2d at 42.

In a case tried in the Superior Court without a jury the court shall make a general finding and shall in addition on request find the facts specially. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein.

## IV.

 [¶ 24] Finally, Michaud claims that the court's sentence contains a "facial jurisdictional infirmity recognizable on direct appeal" because the court set the basic period of incarceration in a range of nineteen to twenty years, rather than a definite term of years. Michaud contends that 17–A M.R.S.A. § 1252–C "contemplates a specific term [for the basic period of incarceration,] rather than a range of years." As we said in *State v. Ardolino*, a range of years rather than a definite term is not a misapplication of principle and does not require vacation of a sentence. *See State v. Ardolino*, 1997 ME 141, ¶¶ 23, 25, 697 A.2d 73, 80–81. Although a better practice might well be to set a precise term of years when establishing the basic period of incarceration, the trial court did not err by setting Michaud's basic period of incarceration in a narrow range of nineteen to twenty years.

The entry is:

Judgment affirmed. Sentence affirmed.

M.R.Crim. P. 23(c) (emphasis added).

15. The purpose of Rule 23(c) is to "enable the requesting party, and the appellate court on review, to ascertain the factual and legal bases for the court's decision." *State v. Levi*, 384 A.2d 40, 42 (Me.1978).